**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| | **Criminal No.  3:20-cr-00013-NKM-JCH** |
| **v.** | |
| | |
| **TIMOTHY LITZENBURG** | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorneys, submits this memorandum in aid of the sentencing of Defendant Timothy Litzenburg.

## I.    Summary of the Government's Sentencing Position

The government respectfully requests that the Court impose a Guidelines sentence of 24 months of imprisonment followed by one year of supervised release.  The government's sentencing recommendation represents the statutory maximum term of imprisonment for the offense of conviction, and appropriately takes into account the advisory Guidelines range, as well as the factors enumerated under 18 U.S.C. § 3553(a).

The defendant's offense conduct warrants the statutory maximum term of imprisonment. The defendant took advantage of his own clients and used them as pawns in an extortion scheme whose only goal was to enrich the defendant and other lawyers.  The defendant has admitted that had he successfully extorted hundreds of millions of dollars, that money would never have been shared with his clients.  In fact, the defendant exhibited a willingness to not only convert his clients' potential claims for his own benefit, but also a willingness to work against his clients' interests by "tak[ing] a dive" and "asking the wrong questions" during a deposition, offering to not advise his clients of their potential claims while simultaneously using those potential claims

for his own personal gain, and asking for a consulting arrangement that would make it more difficult for his clients – to litigate their potential claims.

Moreover, the defendant's conduct does not reflect a momentary lapse in judgment, but a carefully planned scheme that unfolded over a number of months.  The defendant's scheme involved numerous threats communicated over the phone, through electronic mail, and during in-person meetings, a sham "consulting agreement" to use as cover for extortionate payments, and the establishment of a shell corporation to receive extortionate proceeds.  A term of imprisonment of 24 months is also necessary to deter others in the legal profession who would seek to subvert the court system and abdicate their responsibilities to their own clients for personal gain.  Neither the defendant's personal characteristics nor his purported reputational harm suffered by being caught outweigh the need for a term of imprisonment of 24 months.

## II.      Factual Background

During the entirety of the relevant period, the defendant was an active member of the Virginia bar specializing in mass torts actions on behalf of plaintiffs.  The defendant claimed to specialize in litigation involving the herbicide Roundup, which was alleged to have caused cancer in certain users.  At one point in late 2019, the defendant and his associate Daniel Kincheloe claimed to be representing 1,072 clients in Roundup litigation.

Company 1 was a chemicals manufacturer, with facilities located all over the world.  Company 2 was a publicly traded U.S. corporation listed on the NASDAQ exchange.  In or around 2018, Company 2 acquired Company 1.

In September 2019, the defendant made his first contact with Company 1 when he transmitted a draft complaint to Company 1 on behalf of a purported client, M.S., whom the defendant claimed to represent.  The complaint alleged that Company 1 and other related

companies created several chemical compounds used by Monsanto to create Roundup, some of which the complaint alleged to be carcinogenic.

Company 1 subsequently retained Attorney 1 and Attorney 2 to communicate with the defendant. Beginning in September 2019, the defendant communicated repeatedly with Attorney 1 and Attorney 2 via telephone, email, and in person. During these communications, the defendant repeatedly demanded that he be hired as a "consultant" to Company 1 in exchange for (1) not telling his clients about Company 1's possible legal exposure, and (2) not making any public statements about Company 1. For example:

**October 18th Call**: On October 18, 2019, the defendant and Attorney 1 spoke by telephone. During the call, the defendant stated that as a first step, he wished to enter a settlement between one client and Company 1 for $5 million. Separate from the $5 million earmarked for resolving his one client, the defendant indicated that he wanted "consulting arrangements" for himself and his associates worth a total of $200 million. The defendant clarified that the $200 million would not be used to resolve any of the potential lawsuits that could be brought by other plaintiffs. The defendant stated that the $200 million in "consulting" fees would not result in additional releases from litigation by those plaintiffs. The defendant also indicated that, instead of the consulting arrangement being with Company 1, he would also accept a consulting arrangement with Company 1's parent company (Company 2).

**October 24th Email**: On October 24, 2019, the defendant emailed Attorney 1 "in follow up to our discussion about the same."[1] In the email, the defendant demanded $5,000,000 to resolve the draft complaint related to his client. The defendant described resolving that single case as

---

[1] A redacted copy of the October 24 email is attached as Exhibit 1. The government has highlighted certain passages quoted herein.

3

"only a first step."  The defendant then said if the client's case is resolved, "We would simply advertise and sign up more users of Roundup home products that contain [Company 1's ingredients].  In fact, that is precisely our plan, absent some agreement to the contrary."  If Company 1 litigation commenced, the defendant wrote, "[t]his become [sic] an ongoing and exponentially growing problem for [Company 1], particularly when the media inevitably takes notice.  The defense costs and cost to ultimately resolve the thousands or tens of thousands of cases would be well into the billions, setting aside the associated drop in stock price and reputation damage."

The defendant then suggested "a potential solution" that would avoid the costs associated with litigation, reputational damage, and a drop in stock price.  Specifically, the defendant proposed that [Company 1] and the defendant "enter into a consulting arrangement with [Company 1] or a related entity, or some other such relationship [sic]," that would "prevent my firm . . . from suing [Company 1]."  The defendant claimed that with such a "consulting arrangement," "[Company 1] would weather the storm and avoid the parade of horribles I outlined in short form above."

The defendant continued in his email, "Our demand/proposal related to a consulting agreement with my firm and [his associate] is two hundred million ($200,000,000) to be shared by our firms.  As I previously mentioned, please do not misconstrue this demand as indication that we would accept half that or less."  The defendant later described the $200 million "demand" as "a very reasonable price" compared to the "significant financial consequences to [Company 1] of a protracted and public 'Roundup Two.'"

**October 30th Call**:   On October 30, 2019, the defendant spoke telephonically with Attorney 1 and Attorney 2.[2]  At the beginning of the call, Attorney 2 mentioned that he appreciated the defendant emailing his demands; the defendant explained that Attorney 1 had insisted on it and that his initial response had been "Are you sure you want me to put all that down?"

Later during the call, the defendant stated,

> [T]he way that I guess you guys will think about it and we've thought about it too is savings for your side.  I don't think if this gets filed and turns into mass tort, even if you guys win cases and drive value down . . . I don't think there's any way you get out of it for less than a billion dollars.  And so, you know, to me, uh, this is a fire sale price that you guys should consider, uh, you know, for a limited time.

The defendant also confirmed that if he was given the $200 million, he would not be distributing it to his clients, nor would he be informing those clients of potential their ability to bring litigation against Company 1.

When asked what he would do as part of the $200 million consulting arrangement, the defendant proposed a couple of ideas.  First, he stated that he and his associates would discourage others from bringing suit if they were ever consulted on the viability of a lawsuit against Company 1.  Second, the defendant stated he could, in the guise of settling the first litigation, "ask the wrong questions" and "take a dive" during a deposition such that he would create a written record favorable to Company 1 on the issue of toxicological evidence that Company 1's chemicals were carcinogenic.  These ideas were repeated in subsequent conversations.

---

[2] Law enforcement recorded the call based on consent from Attorney 1 and Attorney 2.  A partial transcript of the call is included as Exhibit 2.  The government has highlighted certain passages quoted herein.

**November 12th Meeting**:  On November 12, 2019, the defendant and his associate, Daniel Kincheloe, met with Attorney 1 and Attorney 2 in Charlottesville, Virginia.[3]  At the beginning of the meeting, the defendant suggested that Company 1 and Company 2 had been "been biting their nails for years over this, um, waiting to see, you know, if this problem is gonna come to a head. And we have brought the problem to a head, but only among the people in this room."  He then said that "what's certain, uh, is that if we walk out of here today without a deal, and we, uh, you know, the [M.S.] case gets filed and gets served. And we've talked about the consequences."  The defendant added, "there is no billion dollar solution for this problem to you guys outside of us."

Later, the defendant stated that if litigation commenced, there was no way Company 1 "gets out of it for less" than "[a] billion.  Yeah.  No, I mean, nuisance value, uh, defense lawyer fees, a hit in the stock when this gets filed and served, maybe the press conference, whatever." The defendant then continued, "we can be, um, your biggest problem. Right now we're your only problem or potential problem. . . .  [O]r we can be an asset."

During the in-person meeting, the defendant again claimed the litigation he contemplated would have adverse effects on stock price.

> We walk out of here today, and you're telling them, you know, "You are absolutely, absolutely making a quarter of a million, 500 million, billion plus dollar investment in a public relations nightmare."  You know, [*inaudible*] in a 40% stock loss coming off the top. And that…that's what they're deciding between is whether to avoid that, uh, or to buckle down for that. Uh, you know, there is no… I mean, I know you're gonna have to call and tell your client. The client is gonna be understanding probably 'cause they're gonna be saying, "We don't have to deal with this." They've got a way bigger than a quarter million dollar investment in a…in a nightmare.

---

[3] USPIS recorded the meeting consensually with audio and video.  A partial transcript of the meeting is attached as Exhibit 3.  The government has highlighted certain passages quoted herein.

Later in the meeting, the defendant and Kincheloe confirmed that the consulting agreement and payments would not be made to a victim fund or other account, but rather to the company "Golden Ratio LLC," for which they were the beneficial owners.

**November 14th Email**:  The defendant continued to pursue the "consulting agreement" with Company 1 after the in-person meeting on November 12, 2019.  On November 14, 2019, the defendant, copying Kincheloe, emailed Attorney 1 and Attorney 2 details about the structure of the purported "consulting relationship."[4]   The defendant wrote that "[t]he price has been discussed" and stated that "full payment [was] contemplated on Jan 2, 2020."  The defendant suggested that the contract term "shall be for 40 years," with the first five years "active" and the remaining "a far more passive role."  However, the defendant stated that even during those active years "I would expect the total active consulting to not amount to more than a few weeks per year."

The defendant continued such demands upon Company 1 until he was arrested in December 2019.

### III.   The U.S.S.G. Guidelines

The government agrees that with the U.S. Probation Office's calculation of the defendant's advisory Guidelines as an adjusted offense level 34 and a criminal history of zero, which yields a recommended guidelines sentence of 151 to 188 months' imprisonment.  Given the statutory maximum of 18 U.S.C. § 875(d), the defendant's maximum sentence is 24 months of imprisonment.

### IV.   Section 3553(a) Sentencing Factors

The government's recommended sentence of 24 months of imprisonment falls below the

---

[4] A redacted copy of the November 12 email is attached as Exhibit 4.  The government has highlighted certain passages quoted herein.

151 to 188 months of imprisonment for a defendant with an adjusted offense level of 34, and is therefore presumptively reasonable. *Gall v. United States*, 552 U.S. 38, 51 (2007). Moreover, as set forth below, the factors enumerated in Section 3553(a) also support the Government's sentencing recommendation of 24 months of imprisonment.

### A.  The Offense Conduct

The most appalling aspect of the defendant's offense conduct was his willingness to work against his clients' interests in pursuit of his own financial gain. All attorneys—not just those representing thousands of clients diagnosed with cancer—are necessarily entrusted by their clients with enormous discretion and responsibility. Rather than use that discretion and responsibility to advocate on behalf of his clients, the defendant instead used his clients' potential claims to try and line his own pockets.

First, the defendant's entire scheme was designed to convert his clients' potential claims to his own benefit. The basic premise of the defendant's extortion scheme was that in exchange for a $200 million payment the defendant would not tell the public or his current or future clients that they had potential claims against Company 1. In other words, the defendant's extortionate demand was that $200 million would not only buy his silence with respect to the public, but also his silence with respect to his own clients. Moreover, it matters not whether the defendant believed his clients had meritorious claims against Company 1 because the defendant's conduct was outrageous under either scenario. If the defendant did not actually believe his clients had meritorious claims, he still used those clients and his position as their attorney to threaten a

company and hurt its shareholders for his own gain.[5]   If the defendant did believe his clients had meritorious claims, than the defendant was willing to take a payout in exchange for keeping information to himself that could be potentially valuable to 1,000 cancer patients—his own clients—who had entrusted him to look out for their best interests.

Second, it is clear that the defendant was not going to distribute any of the millions of dollars Company 1 paid him as purported "consulting fees" to his existing clients.   Indeed, the defendant has admitted as such.   Instead, the defendant's plan was to keep $50 million for himself, and split the remainder of the proceeds with other lawyers, including Kincheloe.   The defendant's scheme amounts to not only a breach of the defendant's ethical and fiduciary duties as a lawyer, but a breach of basic civility and kindness one owes the vulnerable, *i.e.* cancer patients who would not even know that their own lawyer had obtained millions of dollars in their name.

Third, the defendant showed a willingness to take specific acts that were intended to hurt his clients' ability to bring claims.   The defendant planned to use the "consulting agreement" with Company 1 to create a conflict of interest so he would no longer be able to represent clients who had claims against Company 1 once he received his millions of dollars.   The defendant also stated he was willing to "take a dive" during a deposition of a toxicology expert identified by Company 1, so that Company 1 could then use the deposition to defend against any potential future claims related to litigation against Company 1.   Undoubtedly, these actions if carried out were squarely against his own clients' interests.

---

[5] Since Company 1's parent company, Company 2, was a publicly traded corporation, the ultimate victims of spurious public allegations aimed to cause a "stock drop" include pension funds, retirees, and others who place their savings in the stock market.

In sum, the brazen disregard the defendant showed to his clients in carrying out the scheme is appalling, and a black mark on the legal profession.  Under any measure the defendant's offense conduct is serious, and supports the government's recommended sentence.

### B.  <u>History and Characteristics of the Defendant</u>

The government understands that there are some personal characteristics the defendant that may seek to offer as mitigation of the defendant's conduct, and that the defendant has suffered significant reputational harm as a result of this prosecution.  However, these factors do not outweigh the need for the imposition of a term of imprisonment.  This is simply not a case involving a momentary lapse in judgment that could be explained by personal struggles, but instead a scheme that was carefully planned and executed over a period of months.  The defendant did not just make a single threat in an email or phone call, but instead he made multiple threats over a significant period of time, and these threats were made during telephone calls, in electronic mail, and even during an in-person meeting.  Just as concerning, the defendant took a number of steps to conceal his conduct from his own clients, he set up a shell corporation to receive proceeds from the scheme, and he continued his extortionate demands over a period of months, from September 2019 until his arrest in December 2019.

Moreover, the fact that the defendant has suffered reputational damage as a result of this prosecution is not a factor that should warrant a variance.  It is true that the extent of the damage done to a defendant's reputation will depend on whether the defendant has a reputation to begin with, and thus lawyers and other defendants convicted of white-collar crimes will as a general matter have further to fall than other defendants.  But it is also true that "[c]riminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime." *United*

*States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999). This defendant is well-educated, and grew up with a number of advantages in life, and was gainfully employed when he started the extortion scheme. To the extent that there are cases where reputational damage could serve in mitigation of imposing a term of imprisonment, this is not such a case. The defendant simply does not possess any unique characteristics that warrant a variance.

### C.  Seriousness of the Offense and Need to Promote Respect for the Law

In order for the sentence imposed in this case "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," as well as "to afford adequate deterrence to criminal conduct" under Section 3553(a)(2), the Government believes that a sentence of incarceration is absolutely necessary. The legal system is a difficult and complex world, foreign to many clients who find themselves in need of an attorney. For this reason, attorneys like the defendant will always have the opportunity to abuse the legal system at the expense of their own clients, particularly where, as here, there is potential for significant financial gain. A sentence of 24 months of imprisonment in this case would serve as a powerful deterrent to those who would abuse the legal system to line their own pockets, and serve as a clear message to those who serve as officers of the Court that significant ethical lapses will be met with significant punishment.

## V.    <u>Conclusion</u>

For the reasons set forth above and others as may be presented at sentencing, the Government respectfully requests that the Court sentence Timothy Litzenburg to a term of imprisonment of 24 months, followed by one year of supervised release.

Respectfully Submitted,

DANIEL J. KAHN
ACTING CHIEF, FRAUD SECTION


/s/ Henry P. Van Dyck
L. Rush Atkinson
Henry P. Van Dyck
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue NW
Washington, DC 20005
202.305.7413
Lawrence.Atkinson2@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certified on that on this 11th day of September, 2020, I filed the foregoing on ECF, which provides service on all counsel of record.

/s/ L. Rush Atkinson_____
Assistant Chief, Fraud Section